## THE COLUMBIA.

(District Court, E. D. New York. July 13, 1903.)

1. INJURY TO EMPLOYÉ—DEFECTIVE HAWSER ON TUG—INSPECTION.

    A tug is liable for injury to an employé thereon from the breaking of its hawser by the swell of a passing steamer bringing an additional strain on the line, it being over a year old, and in a bad condition, as would have been disclosed by a careful inspection, but not being frayed or worn on the outside so as to disclose its condition on the casual inspection given it by the master.

Ralph Underhill, for libelant.
Frank V. Johnson, for claimant.

THOMAS, District Judge. The libelant was a deckhand on the Columbia, and was standing near the hawser which ran from her stern to the barge Rover, in tow, which was carrying about 300 tons of copper, but was not fully loaded. Karlson was standing by for the

¶ 1. See Master and Servant, vol. 34, Cent. Dig. § 237.

tug to enter Erie Basin, and do whatever was necessary in the handling of the hawser, which was in the neighborhood of 35 fathoms, including the bridle, one of whose parts was composed of the main line, and the other of a somewhat smaller line spliced to such main line. The bridle was sufficient in size. While the Rover was going at usual towing speed, the spliced piece of the bridle broke, about one foot from the point of union to the main line, and either whipped against the libelant, or he was thrown against it, in such manner as to break both bones of his right leg, and to inflict other injuries of a less serious character. The evidence shows that, upon a general inspection, the line looked fairly well on the outside, but was in bad condition on the inside. It had been in use for a year, and had been used two or three times a week. After the accident the spliced part of the bridle was replaced and the piece taken out and sold for junk. There is evidence of inspection of a general nature. The captain of the tug stated that he was accustomed to look at it, but did not describe with what care or attention he examined it. His evidence is as follows:

"Q. How long had you known this hawser? A. About one year. Q. How long had it been in use in doing this kind of work? A. I had been using it close on to a year. Q. Was it a new one then? A. Yes, sir. Q. Did you ever examine it and look it over? A. I had occasion to look it over once in awhile. Q. About how frequently? A. Maybe once a day, sometimes—sometimes maybe only once a week. Q. Depending on how often you used it? A. Yes, sir. Q. How often did you use it on the average? A. About twice a week. Q. What was the condition of the rope before the accident? A. It appeared to me to be all right all the time that I used it. Q. Did you see it after it broke? A. Yes, sir. Q. Was there any defect in the rope that you saw? A. No, sir."

It seems from his statement that the master did not discover the bad condition of the broken bridle after the accident. Its condition was so defective that a master of proper capacity should have recognized it. It is inferable from his testimony and his manner of giving it that it was a mere general examination. It was not the careful inspection required of the master. Such detailed examination as was required was not the duty of the libelant, who had been on the vessel but 12 days. The alleged cause for the breaking at the time is that a Sandy Hook boat had passed astern of the tow, and that when the swell from such vessel finally reached the Rover it rolled her in such a way as to bring an additional strain upon the towing line and break it. The evidence shows that the Sandy Hook boat passed astern of the tow in the main channel, the Rover at the time being to the eastward of such channel, at a distance variously estimated from 60 feet by the fireman to 1,500 feet by the captain, and when the swell reached the Rover the Sandy Hook boat was half a mile away. The tow must have traveled some distance before the swell reached it. The tow had just crossed the bay, and was accustomed to towing in such waters, and, of course, to receive the swell of passing vessels. She had a hawser something over a year old, that was in bad condition in fact, although it was not frayed or worn on the outside so as to show bad condition in that respect, upon casual inspection, and there is no evidence of any sort of careful examination.

The libelant was detained from his work about 17 weeks, and makes

the usual complaint of pains at the present time.   He had no medical bills.   His wages were $30 per month and board, and when he watched nights he got $1 extra.   A very moderate compensation is $750, for which the libelant will have a decree.